## CASE No. 1157.

## WILSON v. BRADDY.

1. Good faith should be allowed to have its influence in determining the responsibility of trustees for conduct and transactions affecting their trusts, especially during the time when Confederate currency was the only medium of exchange in this State.

2. Land was sold by the Court of Equity in 1864 for Confederate money at a highly inflated price, and a portion of the purchase-money fell due in January, 1865. *Held*, that this instalment was properly received at maturity by the commissioner in equity, and from him this money was then properly received by a guardian to the extent of his ward's interest in such payment.

3. And a bond of indemnity given by the debtor to the guardian at the time of these payments to secure the latter from any loss by reason of his receipt of Confederate money, imposed no liability upon the debtor.

4. Nor was any liability under this bond fixed upon the obligor by a decree of the court establishing a *devastavit* against the guardian in the receipt of this Confederate money, in a cause between the ward and his guardian to which the obligor was no party.

5. The ordinance of the convention of 1865 was intended only to relax the rules of evidence, so that it might be shown that the contract was made with reference to Confederate currency, and not to fix a measure of liability. That is done, in the absence of other testimony, by the Corbin scaling act.

---

Before PRESSLEY, J., Marion, March, 1881.

Action by John O. Wilson, as executor of the will of W. W. Braddy, deceased, against E. A. Braddy and others, legatees and creditors. The opinion states the case.

*Messrs. Townsend & McKerall*, for appellant.

*Messrs. Johnson & Johnson*, contra.

March 7th, 1882. The opinion of the court was delivered by

SIMPSON, C. J. Judge Pressley, who heard this case on Circuit, makes the following statement of material facts: " In

January, 1864, plaintiff's testator, W. W. Braddy, at a sale by the Court of Equity, bought the land of James Tart, deceased. He paid three-fifths of the price in cash and gave bond and mortgage, payable in two equal instalments, for the remainder. When the first instalment fell due, which was on January 1st, 1865, he offered to pay the same, but E. J. Moody, guardian of Enos M. Tart, a minor, who had a share in said land, refused to receive that share in Confederate money from the commissioner unless W. W. Braddy would give a bond of indemnity to save him harmless. Braddy gave the bond. Moody received the Confederate money."

The minor, E. M. Tart, arriving at age in 1869, brought action against his guardian, Moody, for an accounting and settlement, and recovered judgment against Moody for $1,092, the amount adjudged him on account of the payment to Moody by the commissioner of the first instalment of the land purchased in Confederate money above referred to. How the court reached this amount does not fully appear. It seems, however, that Braddy bought the entire lands of Tart, containing seven hundred and thirteen acres, at $33,600.32, three-fifths to be paid in cash, and the remainder to be paid in one and two years. The cash payment was made, and the remainder, to wit, $13,552, secured by bond and mortgage. Of this remainder Moody was entitled as guardian to one-half.

When the first instalment fell due he received his ward's share in Confederate money under the circumstances above stated. When the second instalment became due, on January 1st, 1866, which was after the war, the parties by valuing the land in good money, and adopting some scale of their own, fixed the amount at $600, which was accepted as payment of that instalment, and the court seems to have adopted this as a basis as to the amount due by Moody to his ward in good money for the Confederate money received by him from the commissioner in payment of the first instalment, and gave judgment for the ward against Moody for $600, with interest from January 1st, 1866, amounting in all to $1,092. From this judgment there was no appeal. In the meantime Moody, the guardian, had become insolvent and failed to pay to his ward the amount thus adjudged

him, with the exception of $66.25, which it seems the ward received.

W. W. Braddy having died, his executor, the plaintiff, instituted the present action to marshal the assets of Braddy's estate, and the creditors being called in, the bond of indemnity given by Braddy to Moody, the guardian, was presented by T. C. Moody, as assignee of E. J. Moody, as a claim against the estate, because of the fact that in the action above referred to he had been held liable for $1,092 to his ward in receiving the Confederate money in which this bond was to indemnify and save him harmless. E. M. Tart, the ward, also claimed this bond as a security for the amount due him from his guardian as established in the action mentioned. The condition of this bond is as follows: "That whereas the said E. J. Moody is guardian of Enos Murchison Tart and is entitled to receive as such guardian a portion of bond in the commissioner in equity's office in said district, which the commissioner in equity is willing to receive in Confederate currency, provided the same will be received by the said E. J. Moody, guardian as aforesaid. Now, if the above bound, William W. Braddy, principal, and his sureties, shall indemnify and save harmless the said E. J. Moody from all liability, expenses, costs, or loss he may incur in consequence of receiving the sum of three thousand eight hundred and thirty-four and eighty-five one-hundredths dollars, the portion to which E. M. Tart is entitled to of the payment now due in Confederate currency, then this obligation to be void and of none effect, else to remain in full force and virtue."

The referee to whom the case was referred reported as to this branch of the case, that he found as matter of fact that the sale of the land purchased by Braddy was based on Confederate money as receivable in payment, and, therefore, that the commissioner in equity and Moody, the guardian, rightfully received that currency in discharge of the first instalment of Braddy's bond. Judge Pressley concurred in this finding of the referee, and decided in substance that if such was the fact, then Moody committed no default as guardian in receiving the Confederate currency, and inasmuch as the bond of indemnity was to save Moody harmless in receiving this currency and not for his failure

to account for it, there had been no breach of this bond, and, therefore, no liability had attached to the estate of Braddy. He also held that T. C. Moody, assignee, was not a purchaser for valuable consideration of the indemnity bond, but that E. M. Tart, the ward, was entitled to it, if in the opinion of this court it could be established against the estate of Braddy, except $66.25, which had been paid Tart by Moody, the guardian. This amount he adjudged would go to T. C. Moody under the assignment, if the bond was recoverable.

E. M. Tart appeals from this decree, alleging error on the part of the Circuit judge, in that he erroneously held that E. J. Moody, the guardian, committed no default in receiving the Confederate money to which the bond of indemnity related, thereby practically reversing, as it is claimed, the judgment of the Circuit Court in the case of *E. M. Tart* v. *E. J. Moody*, his guardian, in which the said E. M. Tart had been adjudged the sum of $1,092, on account of the wrongful receiving of this Confederate currency by his said guardian, from which judgment there had been no appeal. The plaintiff also gave notice of appeal in the event that Judge Pressley's decree should be reversed, on the following grounds: 1. Because E. J. Moody has not been damnified, and until he is there is no liability on the part of the estate of W. W. Braddy on the bond of indemnity. 2. Because if the estate of Braddy is liable at all, the liability is the value of the Confederate money received by Moody as guardian, to be ascertained by the Corbin scaling act and not under the ordinance of the convention.

We concur with Judge Pressley in holding that the commissioner rightfully received Confederate currency on the bond in question on the facts found by the referee, concurred in by himself, and that the guardian did not commit a breach of trust in receiving this money from the commissioner. Independent of the general rule, that where a trustee or other agent acts in good faith, within the scope of his duties, and a loss occurs, that the loss should fall upon the estate rather than upon himself individually, the decisions in reference to receiving Confederate currency during the war, fully sustain the action of the commissioner and trustee in this case. *Neely* v. *McFadden*, 2 *S. C.*

180 ; *Smith* v. *Prothro*, 2 *S. C.* 376 ; *State* v. *Mosely*, 10 *S. C.* 1 ; *West* v. *Cauthen*, 9 *S. C.* 59; *DeSaussure* v. *McClenaghan*, 6 *S. C.* 85.

It will not do to look back from our standpoint to transactions occurring during the war and determine them by our present surroundings. Great injustice would be done by such a course. Things were anomalous then and it was difficult to know what was best. The soundest judgment was often at fault, and men of the highest business capacity and practical sense failed to mark coming events correctly and to foresee their unfortunate results.

There was a complete upheaval in everything. The entire Confederacy, embracing a large portion of the American States, had no other medium of exchange except Confederate currency. Business men in their private affairs, public officials, judicial tribunals, trustees, guardians, and agents, for themselves and for their *cestuis que trust* and wards, and all other classes dealt with it, and there is no reason that fiduciaries should alone be made victims.

Good faith, even in peaceful and quiet times, and when business rules are fixed and well established, has been allowed its influence in the protection of parties occupying such relations, when overtaken by misfortune, much more should it be regarded as to transactions during the war, when all these rules had given way and acts and conduct had to be determined upon a state of things entirely new and in which all were without experience. But especially in this case should these considerations govern. The land out of which Braddy's sale bond originated was sold in Confederate times. It was confessedly with reference to Confederate currency. Indeed the price it brought shows this. The tract contained about seven hundred acres; it brought $33,632 net, nearly $50 per acre, when, according to the testimony, it was not worth more than $10 or $12 in good money; three-fifths were paid in cash in Confederate currency, the balance on a credit of one and two years.

There can be no doubt as to the understanding of the parties. It was bought on a Confederate basis, and was expected to be paid in that currency. When then the commissioner received the money, he did but what his contract required him to do, and

when Moody received it from the commissioner he received the property of his ward. For this receipt he incurred no responsibility except to account for it. Judge Pressley's decree on this branch of the case is sustained upon principle and authority.

It is contended, however, that Braddy's bond of indemnity was intended to save Moody harmless against all loss, &c.; that Moody has been adjudged by the decree in the case of *Tart* v. *Moody* to pay $1,092 on account of his receipt of this Confederate money, and, therefore, the estate of Braddy is responsible for that sum. The object of the indemnity bond when properly construed was intended to save Moody harmless against all loss that he might legally incur. It was intended as a guaranty that Moody could legally receive the Confederate currency. Has there been a breach of the bond in this respect? This we have decided above.

It is true the Circuit Court in the case of *Tart* v. *Moody*, Judge Townsend presiding, decided otherwise, and, Moody having submitted to that decision without appeal, it binds him, but it did not settle the law of the case except as to the parties and privies bound by failure to appeal. Under our view, that decree was clearly erroneous. The ordinance of the convention allowing the value of the property to be inquired into was resorted to to fix the liability of Moody. Under the decisions, this ordinance was never intended as a measure of liability, but was intended to develop the fact, whether the contract was made with reference to Confederate currency or good money. It was intended to relax the rules of evidence and to open the door for the inquiry, whether the term dollar, in contracts during Confederate times, means a Confederate dollar or other currency.

The price which property brought, compared with the real value, was a clear index to this question, and such was its purpose. This question being determined then, the measure of liability was left to other evidence, the act known as Corbin's act, in the absence of other evidence showing a different value at a given time and place, being adopted as the measure for Confederate currency. *Neely* v. *McFadden*, 2 *S. C.* 169; *Harmon* v. *Wallace*, 2 *S. C.* 208; *Parker* v. *Wilson*, 3 *S. C.* 296; *Moore* v. *Johnson*, 7 *S. C.* 308; 8 *Wall.* 1. This principle should have been applied in the case of *Tart* v. *Moody*, and if it had

been, Moody could have been held responsible only for the value of the Confederate money which he received from the commissioner, and, perhaps, not even for that, if this money died on his hands without fault on his part.

Suppose Braddy had not paid the commissioner, would his liability after the war, under the facts of this case, been greater than the value of his bond scaled by Corbin's act? We think not. If so, this is all that could legally have been adjudged against Moody. When he received the Confederate money on Braddy's bond he virtually occupied to his ward the position that Braddy had to the commissioner, and he should not have been held to higher responsibility than Braddy would have been had he never paid it. We have said, however, that the judgment in the case of *Tart* v. *Moody*, being unappealed from, binds Moody. Does it bind Braddy? Judgments bind parties and their privies only. Braddy was no party to that suit. He was not summoned as an original party, nor indeed could he have been under the then state of the pleadings. He was not even touched by Moody. He was in no sense a party.

Was he a privy? Privies are of two kinds, privies in blood and privies in estate. We cannot see that Braddy occupied either of these relations. The suit was by Tart against Moody, as his guardian, for account and settlement, and Moody in no sense represented Braddy. In *Bond* ads. *Ward*, 1 *N. & McC.* *200, A. gave B., a constable, an indemnity bond to levy and sell a mare of C., which B. did. C. recovered the value of the mare of B. B. then brought an action on the indemnity bond. *Held*, that he could not recover, not having given notice to A. of previous action. In *Burrill* v. *West*, 2 *N. H.* 192, where the plaintiff brought action on a promise to save harmless, the same doctrine was held. See *Big. Estop*. 66. Also the *Ordinary* v. *Condy*, 2 *Hill* 313.

It is the judgment of this court that so much of the judgment of the Circuit Court as adjudged that Braddy's estate was not liable for the receiving of Confederate money by Moody, the guardian, and also so much as held that Braddy's estate was not bound by the judgment in the case of *Tart* v. *Moody*, is affirmed.

McIVER and McGOWAN, A. J's., concurred.